**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| SUSAN ROSS, | ) | CASE NO. 5:11-cv-1167 |
| | ) | |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE |
| v. | ) | VECCHIARELLI |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | **MEMORANDUM OPINION AND** |
| Defendant. | ) | **ORDER** |

Plaintiff, Susan Ross ("Plaintiff"), challenges the final decision of Defendant,

Michael J. Astrue, Commissioner of Social Security ("the Commissioner"), denying her

application for a Period of Disability ("POD") and Disability Insurance Benefits ("DIB")

under Title II of the Social Security Act, 42 U.S.C. §§ 416(i), 423 ("the Act").  This Court

has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned

United States Magistrate Judge pursuant to the consent of the parties entered under

the authority of 28 U.S.C. § 636(c)(2).  For the reasons set forth below, the

Commissioner's final decision is AFFIRMED.

## I.    PROCEDURAL HISTORY

On June 28, 2007, Plaintiff filed an application for a POD and DIB and alleged a

disability onset date of June 1, 1999.  (Tr. 17.)  Her application was denied initially and

upon reconsideration, so she requested a hearing before an administrative law judge

("ALJ").  (Tr. 17.)  On February 9, 2010, an ALJ held Plaintiff's hearing.  (Tr. 17.)

Plaintiff appeared, was represented by counsel, and testified.  (Tr. 17.)  A vocational

expert ("VE") also appeared and testified.  (Tr. 17.)  On July 27, 2010, the ALJ found

Plaintiff not disabled.  (Tr. 23.)  On May 9, 2011, the Appeals Council declined to review

the ALJ's decision, so the ALJ's decision became the Commissioner's final decision.

(Tr. 1.)

On June 7, 2011, Plaintiff filed her complaint to challenge the Commissioner's

final decision.  (Doc. No. 1.)  On October 8, 2011, Plaintiff filed her Brief on the Merits.

(Doc. No. 11.)  On December 12, 2011, the Commissioner filed his Brief on the Merits.

(Doc. No. 13.)  Plaintiff did not file a Reply Brief.

Plaintiff asserts five assignments of error:  (1) the ALJ failed to assess the

opinions of Plaintiff's treating physician, Dr. Calabrese, properly and give good reasons

for giving those opinions less than controlling weight; (2) the ALJ failed to discuss the

opinions of Plaintiff's treating psychologist, Dr. Irwin; (3) the ALJ failed to deem

Plaintiff's depression a severe impairment; (4) the ALJ failed to analyze whether

Plaintiff's depression met or medically equaled an impairment listed in 20 CFR Part

404, Subpart P, Appendix 1 (the "Listings"), particularly Listing 12.04; and (5) the ALJ's

RFC is not supported by substantial evidence.

## II.  EVIDENCE

### A.    Personal and Vocational Evidence

Plaintiff was 46 years old on her date last insured.  (Tr. 138.)  She had a four-

year college education (Tr. 20, 136) and past relevant work experience as a merchandise supervisor (Tr. 22).  Her Disability Report indicates that she believed she was disabled because of chronic fatigue syndrome and fibromyalgia.  (Tr. 126.)

### B.    Medical Evidence[1]

On July 13, 1999, Plaintiff presented to Dr. Andrew C. Raynor, M.D., who indicated that Plaintiff reported she recently had been terminated from her job as a magazine marketer; that she "feels good" about losing her job because the job was stressful; and that she was "[d]oing well."  (Tr. 257.)  Dr. Raynor diagnosed Plaintiff with fibromyalgia.  (Tr. 257.)  On March 20, 2000, Dr. Raynor indicated that Plaintiff reported she "[b]asically was doing okay."  (Tr. 199.)  On January 25, 2001, Dr. Raynor indicated that Plaintiff reported her fatigue "remains a tremendous problem," and he opined that Plaintiff "likely [had] chronic fatigue syndrome."  (Tr. 195.)  He recommended that Plaintiff present to "Dr. Calabrese" for an evaluation.  (Tr. 195.)

On April 30, 2003, Plaintiff presented to Dr. Leonard H. Calabrese, D.O., with a main complaint of shallow breathing.  (Tr. 299-301.)  Dr. Calabrese indicated that Plaintiff reported she was under increased stress regarding her husband and work.  (Tr. 299.)  Dr. Calabrese was of the impression that Plaintiff suffered a "flare of [chronic

---

[1] The Commissioner did not set forth Plaintiff's relevant medical history in his Brief on the Merits, but noted that such "facts are set forth in the ALJ's decision . . . and Plaintiff's brief."  (Def.'s Brief 2 n.2.)  The Court reminds the Commissioner that the Magistrate Judge's initial order in this case instructs that "Defendant's brief . . . shall cite, by exact and specific transcript page number, all relevant facts in a 'Facts' section."  (Doc. No. 4.)  The Commissioner has not been excused from complying with this order, and the Court expects the Commissioner to properly set forth all facts relevant to his arguments in future briefs unless otherwise instructed by Court order.

fatigue syndrome] due to situational stress," and he prescribed Plaintiff Effexor.  (Tr. 300.)

On February 5, 2004, Plaintiff presented to Dr. Sandra V. Hazra, M.D., for a follow-up on her chronic fatigue syndrome.  (Tr. 208.)  Dr. Hazra indicated the following. Plaintiff "has seemed to find a working homeostasis situation of being fatigued and having a lot of symptoms including joint symptoms and difficultly with concentration and on and on as I have summarized in previous charts verses [sic] a reasonably good life." (Tr. 208.)  Nevertheless, Plaintiff "has become a campaign manager for a couple of politicians . . . is selling antiques . . . [and] is out and about all the time."  (Tr. 208.) Further, Plaintiff "looks quite good," and "does not give us any symptoms of significant migratory arthritis[, although s]he does have some occasional pain in her hands and some occasional stiffness."  (Tr. 208.)  Dr. Hazra concluded that Plaintiff "is doing fairly well" and "is a lot less tired then [sic] she was and she can concentrate a lot better with the addition of  . . . Effexor."  (Tr. 208.)

On August 25, 2005, Plaintiff returned to Dr. Hazra for a "6 month check-up." (Tr. 245.)  C. Hanlon, a certified nurse practitioner, indicated that Plaintiff reported she had "no complaints" except for feeling tired and "run down."  (Tr. 245.)

From 2005 through 2007, Plaintiff continued to present to Dr. Calabrese for follow-ups on her chronic fatigue syndrome and fibromyalgia.  (Tr. 436, 439, 431.)  Dr. Calabrese indicated that Plaintiff continued to suffer diffuse pain and daily headaches. (Tr. 436, 439, 431.)  On June 7, 2006, he counseled Plaintiff to consider disability.  (Tr. 440.)  On May 29, 2007, he indicated that Plaintiff's fatigue was "virtually unchanged," chronic, and severe; and that he was of the impression that Plaintiff was "unable to

4

function in the work place" because she had not worked in eight years.  (Tr. 434.)

On October 2, 2007, state agency reviewing psychologist Frank Orosz, Ph.D., performed a Psychiatric Review Technique and determined that there was insufficient evidence in the record to determine the severity of any mental impairments.  (Tr. 455, 467.)

On February 5, 2008, state agency reviewing psychologist Robyn Hoffman, Ph.D., performed a Psychiatric Review Technique, assessed Plaintiff under Listing 12.04 regarding affective disorders, and indicated that Plaintiff suffered a depressive disorder.  (Tr. 475, 478.)  Dr. Hoffman opined that Plaintiff had mild restrictions in her activities of daily living and no episodes of decompensation of extended duration.  (Tr. 485.)  She further noted that there was insufficient evidence of the extent to which Plaintiff was limited in maintaining social functioning and concentration, persistence, or pace.  (Tr. 485.)  In short, Dr. Hoffman noted that the "[i]nformation given is not sufficient to fully evaluate [Plaintiff's] mental disorder."  (Tr. 487.)  On February 28, 2008, state agency reviewing physician Edmond Gardner, M.D., affirmed Dr. Hoffman's findings.  (Tr. 489.)

On February 19, 2008, Dr. Sharon Irwin, Ph.D., authored a "teledictation" and explained her treatment relationship with Plaintiff as follows.  (Tr. 473.)   Plaintiff presented to Dr. Irwin in June 2001 with chronic fatigue, a "very unhappy marriage" of 17 years, "very little emotional support," and "a very low ability to tolerate any type of stress."  (Tr. 473.)  Plaintiff continued to present to Dr. Irwin on approximately 41 occasions until February 17, 2004.  (Tr. 473.)  Dr. Irwin's diagnoses included recurrent depression, and Dr. Irwin had assigned Plaintiff with a Global Assessment of

5

Functioning ("GAF") score of 50.[2]  (Tr. 473.)  Dr. Irwin summarized that Plaintiff "had

great difficulty functioning," "did not seem able to hold a job," and had a "poor" ability to

tolerate stress.  (Tr. 473.)  Dr. Irwin noted that "this is 4 years ago that I have seen her."

(Tr. 473.)

On May 26, 2009, Dr. Calabrese authored a letter and described his treatment

relationship and opinion of Plaintiff's functional abilities as follows.  (Tr. 537-38.)  Dr.

Calabrese treated Plaintiff's chronic fatigue syndrome since 2001.  (Tr. 537.)  Plaintiff's

"major problems have been energy, sleep, pain, memory, and concentration."  (Tr. 537.)

Plaintiff's condition was complicated by pain, exacerbated by stress, and "had

precluded [Plaintiff] from productive activity within the workforce."  (Tr. 537.)  Further,

Plaintiff had undergone counseling and had been on long-term antidepressants,

although Dr. Calabrese's opinion was that Plaintiff did not have a major depressive

disorder with secondary physical symptoms, but rather depression secondary to her

condition.  (Tr. 537.)

Dr. Calabrese noted that "[l]aboratory studies are relatively unremarkable."  (Tr.

537.)  Nevertheless, Dr. Calabrese described Plaintiff's limitations as follows:

> In terms of her activities of daily living, she does not get dressed on a daily
> basis. She does not take tub baths because it is too exhausting of a process.
> She is unable to take care of her house, such as bed making, laundry, et
> cetera, and her husband makes the meals and gets carry outs. She can
> wash dishes on an occasional basis but this is unpredictable.  She is unable
> to do activities such as vacuuming, laundry, shop for food, put out trash,

---

[2] A GAF score between 41 and 50 indicates serious symptoms or a serious
impairment in social, occupational, or school functioning.  A person who scores
in this range may have suicidal ideation, severe obsessional rituals, no friends,
and may be unable to keep a job.  *See Diagnostic and Statistical Manual of
Mental Disorders* 34 (American Psychiatric Association, 4th ed. rev., 2000).

mow lawn, gardening, et cetera.  In terms of cognitive function, she is unable to do bill paying because of difficulty with memory and concentration. They have some pets, but she is unable to care for them.

In terms of exercise, she can occasionally take walks at a slow pace for up to 30 minutes, but these are unpredictable. She is able to stand and sit for prolonged periods of time, but when her fatigue is severe, it is unpredictable and precludes even these activities.  She climbs stairs only occasionally and infrequently drives.  She has major degrees of sleep disturbance and stays in bed about 12 hours a day. She is unable to lift much because of poor stamina and muscle weakness.

(Tr. 537.)  Dr. Calabrese concluded that Plaintiff's "life is drastically and permanently altered," and Plaintiff "is unable to maintain an active position in the workforce."[3]  (Tr. 538.)

On December 21, 2009, Dr. Calabrese authored a medical source statement regarding Plaintiff's physical and mental functional capacities based on the findings in his letter.  (Tr. 548-51.)  Dr. Calabrese assessed Plaintiff's physical functional capacity as follows.  Plaintiff could lift and carry 5 pounds occasionally and 2 pounds frequently; stand and walk for 1 hour total in an 8-hour workday and for one quarter of an hour at a time without interruption; and sit for a total of 6 hours in an 8-hour day and for 1 hour without interruption.  (Tr. 548.)  She could rarely or never climb, balance, stoop, crouch, kneel, or crawl.  (Tr. 548.)  She could rarely or never reach, handle, feel, push or pull, perform fine manipulation, or perform gross manipulation.  (Tr. 549.)  She should be restricted from exposure to heights, moving machinery, temperature extremes, chemicals, dust, noise, and fumes.  (Tr. 549.)  She required a sit/stand option and

---

[3]  Plaintiff states that "[w]hile not explicitly stated by Dr. Calabrese, this report was written in a way to reflect his opinion of [Plaintiff's] condition throughout their treating relationship."  (Pl.'s Br. 7.)  This unsupported statement is merely Plaintiff's interpretation of Dr. Calabrese's letter.

7

breaks throughout the workday in addition to normal breaks.  (Tr. 549.)

Dr. Calabrese assessed Plaintiff's mental functional capacity as follows.  Plaintiff had a "poor" ability to:  maintain attention and concentration for extended periods of 2 hour segments; respond appropriately to changes in routine settings; maintain regular attendance and be punctual within customary tolerances; deal with the public; deal with work stress; complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; maintain her appearance; socialize; behave in an emotionally stable manner; and relate predictably in social situations.  (Tr. 550-51.)  She had a "fair" ability to relate to co-workers; interact with supervisors; work in coordination with or proximity to others without being unduly distracted or distracting; understand, remember, and carry out complex and detailed instructions; and leave home on her own.  (Tr. 550-51.)  She had a "good" ability to understand, remember, and carry out simple job instructions, as well as manage funds and schedules.  (Tr. 550-51.)  She had an unlimited ability to follow work rules, use judgment, and function independently without special supervision.  (Tr. 550.)

C.     Hearing Testimony

1.     Plaintiff's Hearing Testimony

Plaintiff testified at her hearing as follows.  Plaintiff was married and lived with her husband.  (Tr. 33.)  She believed she was unable to work because of her fatigue and weakness.  (Tr. 48.)  She also suffered fibromyalgia-related pain all over her body.  (Tr. 49.)  She could lift and carry about 5 or 6 pounds.  (Tr. 53.)  She could stand for

8

between 15 and 30 minutes before she needed to sit.  (Tr. 54.)  She could sit, but she preferred to recline or lie.  (Tr. 55.)  She could walk for approximately 30 minutes.  (Tr. 54.)  She could walk down stairs, but she needed to rest while going up stairs.  (Tr. 56)  She could bend at the waist, kneel, crawl, and reach for objects in front of her.  (Tr. 56-57.)  She had problems reaching overhead with her right hand, however, because she had "a little bit of a frozen shoulder."  (Tr. 57.)  She also could use eating utensils without difficulty; write, although her hands would hurt; and pick up small objects such as paper clips and put them into a container.  (Tr. 58.)  But she had difficulty opening bottles of water or milk and using a manual can opener (Tr. 55); and she could not perform activities such as picking up paper clips for 8 hours a day.  (Tr. 63.)

Plaintiff did not prepare meals and only washed "light" dishes rather than "regular" dishes.  (Tr. 34.)  She did the laundry, however, because she was concerned that her husband would lose things.  (*See* Tr. 34.)  Her washing machine and dryer were in the basement of her home.  (Tr. 35.)  Sometimes her mother helped her with the laundry.  (Tr. 34.)  She could use a light-weight vacuum on hard floors, but she needed to sit down periodically while doing so.  (Tr. 36.)  It was too difficult to vacuum carpet or large rooms.  (Tr. 36.)  She did not dust, go shopping, or run other errands.  (Tr. 37.)  It was difficult for her to care for her pets, and her husband most often did so.  (Tr. 44.)

Regarding Plaintiff's personal care, she did not have the energy to "maintain" herself as she would like to.  (Tr. 38.)  She did not dress herself every day, but often would remain in her pajamas.  (Tr. 61.)

Plaintiff did not read or engage in hobbies such as studying genealogy as much

9

as she would have liked because she lacked sufficient energy and mental focus after attempting to perform chores around the house.  (Tr. 39.)  She did not belong to clubs or spend time with friends because her relationships had weakened, as she had not "participated in functions for years."  (Tr. 40.)  She maintained family relationships mostly through using the telephone.  (*See* Tr. 41, 43.)  She slept approximately 12 hours a night, and she required 30 minutes upon waking to get out of bed.  (Tr. 42-43.)  She had undergone counseling "on and off" with Dr. Irwin.  (Tr. 62.)

Plaintiff's last job was as a merchandise supervisor.  (Tr. 46.)  The job entailed between 16 and 22 hours of work a week, and she was able to work from home on occasion.[4]  (Tr. 46.)  She was terminated from that job on June 1, 1999, because her company restructured and her position was eliminated.  (Tr. 47.)

## 2.    Vocational Expert's Hearing Testimony

The ALJ posed the following hypothetical to the VE:

Assuming we have a person of the same age, education, and employment background as [Plaintiff], this person is lifting and carrying 20 pounds occasionally, 10 pounds frequently; standing and walking for six; sitting for six, but is gonna need a sit/stand option every 30 minutes; this person is occasionally climbing stairs and ramps, bending and balancing, stooping, and kneeling, and crawling; this person is - this person is reaching in all directions, however we're going to say that overhead reaching is only - how do I say this?  When reaching overhead it is done - the use of the right, of the dominant arm is occasional, okay, overhead reaching with occasional use of the dominant arm . . . .  This person is handling, fingering, and feeling but not on a repetitive basis. We're not going to expose this person to any hazardous conditions.

(Tr. 66-67.)  The VE testified that such a person could perform Plaintiff's past relevant

---

[4]  The ALJ found that Plaintiff's past relevant work as a merchandise supervisor constituted substantial gainful activity (Tr. 19, 22), and Plaintiff has not taken issue with this finding.

work.  (Tr. 67.)  The ALJ then amended the hypothetical "to reflect that instead of non repetitive handling, fingering, and feeling, we now have occasional handling, fingering, and feeling."  (Tr. 67.)  The VE testified that such a person could not perform other work in the national economy.  (Tr. 67.)

Plaintiff's counsel posed the following hypothetical to the VE:

> Going back to the . . . first hypothetical . . . reduce the weight limits to five pounds maximum - to five pounds maximum, to standing and walking one hour total out of an eight hour day, and sitting to six hours total . . . the individual would need breaks more frequently than every two hours . . . and . . . the work should be low stress as defined as no rapid or high production goals or quotas, no rapid performance, . . . no intense interaction with public, co-workers, or supervisors.

(Tr. 68-69.)  The VE testified that such a person could not perform any work.  (Tr. 69.)

The VE testified that his testimony was consistent with the Dictionary of Occupational Titles ("DOT") and his professional experience.  (Tr. 68.)

### III.    STANDARD FOR DISABILITY

A claimant is entitled to receive benefits under the Social Security Act when she establishes disability within the meaning of the Act.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs., 667 F.2d 524 (6th Cir. 1981)*.  A claimant is considered disabled when she cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. § 416.905(a).  To receive SSI benefits, a recipient must also meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 *and* 416.1201.

11

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) *and* 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience.  20 C.F.R. §§ 404.1520(d) *and* 416.920(d).  Fourth, if the claimant's impairment does not prevent her from doing her past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f).  For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

## IV.   SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.    Ms. Ross last met the insured status requirements of the Social Security Act on December 31, 2004.

2.    Ms. Ross did not engage in substantial gainful activity (SGA) during

the period from her alleged onset date of June 1, 1999, through her date last insured of December 31, 2004.

3.    Through the date last insured, Ms. Ross had the following severe impairments:  Chronic Fatigue Syndrome[] and[] Fibromyalgia.

4.    Through the date last insured, Ms. Ross did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

5.    After careful consideration of the entire record, the undersigned finds that, through the date last insured, Ms. Ross had the residual functional capacity to perform light work . . . with some exceptions. More specifically, Ms. Ross can: lift, carry, push and/or pull 20 pounds occasionally and 10 pounds frequently; sit, stand and/or walk 6 hours in an 8-hour workday, with a sit/stand option every 30 minutes; occasionally climb stairs and ramps; occasionally bend, balance, stoop, and kneel; reach in all directions, but only occasionally reach overhead with her dominant arm; and[] handle, finger and feel, but not on a repetitive basis.  In addition, Ms. Ross is to avoid exposure to hazardous conditions, such as unprotected heights and dangerous machinery.

6.    Through the date last insured, Ms. Ross was capable of performing past relevant work as a merchandise supervisor.  This work did not require the performance of work-related activities precluded by Ms. Ross's residual functional capacity.

7.    Ms. Ross was not under a disability, as defined in the Social Security Act, at any time from June 1, 1999, the alleged onset date, through December 31, 2004, the date last insured.

(Tr. 19-23.)

## V.    LAW & ANALYSIS

### A.    Standard of Review

Judicial review of the Commissioner's decision is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512

(6th Cir. 2010).  Review must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The court may look into any evidence in the record to determine if the ALJ's decision is supported by substantial evidence, regardless of whether it has actually been cited by the ALJ.  *Id.*  However, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's conclusions must be affirmed absent a determination that the ALJ failed to apply the correct legal standards or made findings of fact unsupported by substantial evidence in the record.  *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *Brainard*, 889 F.2d at 681.  A decision supported by substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion.  *Ealy*, 594 F.3d at 512.

The burden of showing that an error is harmful normally falls upon the party attacking the agency's determination.  *Shinseki v. Sanders*, 556 U.S. 396, 129 S. Ct. 1696, 1706 (2009).

**B.     The ALJ's Assessment of Plaintiff's Treating Sources**

Plaintiff contends that the ALJ failed to address the opinions of her treating physician, Dr. Calabrese, properly and give good reasons for giving those opinions little weight; and erroneously failed to discuss the opinions of her treating psychologist, Dr.

Irwin.  For the following reasons, these assignments of error are not well taken.

An ALJ must give the opinion of a treating source controlling weight if she finds the opinion well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in the case record. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (quoting 20 C.F.R. § 404.1527(d)(2)) (internal quotes omitted).  Conversely, a treating source's opinion may be given little weight if it is unsupported by sufficient clinical findings and is inconsistent with the rest of the evidence.  *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993). If the opinion of a treating source is not accorded controlling weight, an ALJ must consider certain factors in determining what weight to give the opinion, including:  (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the supportability of the opinion; (4) the consistency of the opinion with the record as a whole; and (5) the specialization of the treating source.  *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 747 (6th Cir. 2007) (citing *Wilson*, 378 F.3d at 544 and 20 C.F.R. § 404.1527(d)(2)).  If an ALJ decides to give a treating source's opinion less than controlling weight, she must give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight.  *See Wilson*, 378 F.3d at 544 (quoting S.S.R. 96-2p, 1996 WL 374188, at *5 (S.S.A.)).

Here, the ALJ gave Dr. Calabrese's opinions less than controlling weight for the following reasons:

15

> Dr. Calabrese concluded that [Plaintiff's] life was drastically and permanently altered and he opined that she was unable to maintain an active position in the workforce . . . .  It is important to note that  a finding that an individual is "disabled" or "unable to work," is an administrative finding and is an issue reserved to the Commissioner . . . .  Dr. Calabrese apparently relied heavily on the subjective report of symptoms and limitations provided by [Plaintiff], and seemed to uncritically accept as true most, if not all, of what she reported. Further, this opinion was rendered after [Plaintiff's] date last insured.

(Tr. 22.)  The ALJ properly gave less than controlling weight to Dr. Calabrese's opinion that Plaintiff could not work.  *See* 20 C.F.R. § 404.1527(e); S.S.R 96-5p, 1996 WL 374183, at *1 (1996); *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985).

Plaintiff contends that the ALJ's reasons for giving less than controlling weight to Dr. Calabrese's opinions are not "good reasons" because the reasons "entirely disregard[] the mental and physical functional capacity opinions submitted . . . on December 21, 2009."  Plaintiff's argument is not supported by the record.  Dr. Calabrese's mental and physical RFC assessments are based on his letter, and the letter consists largely of Plaintiff's subjective reports of the extent to which she is limited.  Further, the RFC assessments clearly were rendered after Plaintiff's date last insured—specifically, five years later.  There is no basis to conclude that the ALJ failed to consider the RFC assessments.

Plaintiff also seems to suggest that the ALJ failed to consider the various factors required by the regulations in assessing a treating source's opinions and failed to give good reasons for giving less than controlling weight to Dr. Calabrese's "other" opinions. Plaintiff does not elaborate on these arguments and explain what, exactly, the ALJ failed to address properly; accordingly, these arguments are deemed waived.  *See Rice v. Comm'r of Soc. Sec.*, 169 F. App'x 452, 454 (6th Cir.2006) ("It is well-established that

16

'issues averted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.'") (quoting *McPherson v. Kelsey*, 125 F.3d 989, 995–996 (6th Cir.1997)).

As to Dr. Irwin's opinions, the ALJ did not discuss them; however, the Sixth Circuit has noted in dicta that a violation of the treating physician rule may amount to harmless error if the treating source's opinion is "so patently deficient that the Commissioner could not possibly credit it." *Wilson*, 378 F.3d at 547. Here, Dr. Irwin expressed her opinions in a letter dated four years after she last saw Plaintiff, and she did not include any treatment records or notes in support of her opinions. The Court concludes that Dr. Irwin's opinions are so patently deficient that the ALJ's failure to mention them was harmless error. *See Sharp v. Barnhart*, 152 F. App'x 503, 508 (6th Cir. 2005) (finding that the ALJ's failure to comply with the procedural requirements for rejecting a treating physician's opinion was harmless because the physician never explained his opinion). Indeed, courts are not required to "convert judicial review of agency action into a ping-pong game" where "remand would be an idle and useless formality, *NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 766 n.6 (1969), and "[n]o principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result." *Shkabari v. Gonzales*, 427 F.3d 324, 328 (6th Cir. 2005) (quoting *Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir.1989)).

In short, for the reasons set forth above, Plaintiff's contentions that the ALJ failed to assess the opinions of Plaintiff's treating physician and psychologist properly are not

17

well taken.

### C.     The ALJ's Assessment of Plaintiff's Depression

Plaintiff contends that the ALJ failed to deem her depression a severe

impairment and analyze whether it met or medically equaled Listing 12.04.  For the

following reasons, these assignments of error are not well taken.

Although the determination of severity at the second step of a disability analysis

is a *de minimis* hurdle in the disability determination process, *Higgs v. Bowen*, 880 F.2d

860, 862 (6th Cir. 1988), the goal of the test is to screen out totally groundless claims,

*Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 89 (6th Cir.1985).  Once an ALJ

determines that a claimant suffers a severe impairment at step two of his analysis, the

analysis proceeds to step three; accordingly, any failure to identify other impairments or

combinations of impairments as severe would be only harmless error because step two

would be cleared.  *Anthony v. Astrue*, 266 F. App'x 451, 457 (6th Cir. 2008) (citing

*Maziars v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987)); *Pompa

v. Comm'r of Soc. Sec.*, 73 F. App'x 801, 803 (6th Cir. 2003) ("Because the ALJ found

that Pompa had a severe impairment at step two of the analysis, the question of

whether the ALJ characterized any other alleged impairment as severe or not severe is

of little consequence.").  All of a claimant's impairments, severe and not severe, must

be considered at every subsequent step of the sequential evaluation process.  *See* 20

C.F.R. § 404.1545(e).

The ALJ did not consider Plaintiff's diagnosis of depression at step two; however,

she found that Plaintiff suffered severe chronic fatigue syndrome and fibromyalgia.

Upon the ALJ's finding of these severe impairments, Plaintiff cleared step two of the disability analysis.  *See Anthony*, 266 F. App'x at 457.

At step three, the ALJ found that "[n]o treating or examining physician has indicated findings that would satisfy the severity requirements of any listed impairment." (Tr. 19.)  The ALJ continued that he based this finding on "the opinions of the State Agency medical consultants who evaluated this issue at both the initial and reconsideration levels of the administrative review process and reached the same conclusion."  (Tr. 19-20.)  The ALJ's observation is accurate, as Dr. Orosz and Dr. Hoffman found, and Dr. Gardner affirmed, that there was insufficient evidence in the record to establish that Plaintiff met or medically equaled the Listings.  Although Dr. Irwin indicated that Plaintiff suffered depression, her opinion is not supported by any explanation or treatment records.  And although Dr. Calabrese believed Plaintiff had depression secondary to her other conditions, he offered that opinion over four years after Plaintiff's last date insured, he was not a mental health specialist and did not treat Plaintiff for mental health issues, and he provided no explanation or treatment notes related to such alleged depression.  The record essentially suggests only a diagnosis of depression, and a mere diagnosis says nothing about the severity of an impairment. *See, e.g., Foster v. Bowen*, 853 F.2d 483, 489 (6th Cir. 1988) ("The mere fact that plaintiff suffered from a dysthymic disorder . . . does not automatically entitle plaintiff to the receipt of benefits.  Rather, in order to qualify for the receipt of benefits . . . plaintiff must show that she was disabled by her dysthymic disorder."); *Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) ("The mere diagnosis of arthritis, of course, says nothing about the severity of the condition.").

It is the claimant's burden to show that she meets or medically equals an impairment in the Listings.  *Evans v. Sec'y of Health & Human Servs.*, 820 F.2d 161, 164 (6th Cir. 1987) (per curiam).  When a claimant is represented by counsel, typically it is counsel's responsibility to structure the claimant's case in a way that claims of disability are adequately explored.  *See Carrico v. Comm'r of Soc. Sec.*, No. 5:09-cv-2083, 2011 WL 646843, at *8 (N.D. Ohio Jan. 21, 2011) (citing *Hawkins v. Chater*, 113 F.3d 1162, 1167 (10th Cir.1997)).  Here, Plaintiff never reported that she believed she was disabled because of depression, but rather focused her claims on her chronic fatigue and fibromyalgia.

In short, there is no basis to conclude that Plaintiff suffered severe depression and that the ALJ should have considered whether any such depression met or medically equaled Listing 12.04.  Accordingly, these assignments of error are not well taken.

### D.    The ALJ's RFC Determination

Plaintiff contends that the ALJ's RFC determination is not supported by substantial evidence because Dr. Calabrese's and Dr. Hazra's opinions do not support it; and because "[t]he ALJ failed to provide a logical bridge between the medical evidence and her RFC determination."  (Pl.'s Br. 14.)  For the following reasons, these contentions are not well taken.

To be entitled to disability insurance benefits, a claimant must establish that she was disabled prior to her date last insured.  *See* 20 C.F.R. §§ 404.315(a)(1) *and* 404.320(b)(2)*; see also Key v. Callahan*, 109 F.3d 270, 274 (6th Cir. 1997)*.*  The ALJ

based his RFC determination, in part, on the following:

- Plaintiff lost her last job because of corporate restructuring, not because of any impairments.

- Dr. Raynor indicated in 1999 that Plaintiff reported "doing well," and in 2000 reported "doing okay."

- Dr. Calabrese indicated in 2003 that Plaintiff had only "some" pain and "responded beautifully" to medication and exercise; and that Plaintiff's insights into the nature of her impairments and her ability to modify them were "excellent."

- Dr. Hazra indicated in 2004 that Plaintiff was doing well and looked "quite good"; was able to concentrate in her functioning of daily activities; was acting as a political campaign manager, was selling antiques, and was out and about all of the time; had no significant symptoms of migratory arthritis; and reported she had only occasional pain and stiffness in her hands.

- Plaintiff's testimony of the extent to which she was limited was not entirely credible.

(Tr. 21-22.)  Contrary to Plaintiff's contentions, Dr. Calabrese's and Dr. Hazra's opinions are consistent with Plaintiff's RFC determination.[5]  The ALJ's opinion is sufficiently clear and specific to understand why she found that Plaintiff was not disabled during the period of time in which she was insured, and substantial evidence supports that determination.  Accordingly, this assignment of error is not well taken.[6]

---

[5]  Plaintiff suggests that the ALJ "cherry picked" Dr. Hazra's opinions—that is, purposefully selected only those aspects of the opinions that supported his determination and ignored contrary evidence—because Dr. Hazra also indicated that Plaintiff suffered "a lot of symptoms."  The Court disagrees with Plaintiff's characterization of the ALJ's analysis of the record.  The ALJ never disputed that Plaintiff suffered "symptoms," and the ALJ adequately accounted for the fact that Dr. Hazra reported Plaintiff was "doing fairly well" and was performing significant work-like activities notwithstanding those "symptoms."

[6]  Plaintiff also argues that the VE's testimony does not constitute substantial evidence to support the Commissioner's step-five burden of showing Plaintiff could perform other work that existed in significant numbers in the national

## VI.    CONCLUSION

For the foregoing reasons, the Commissioner's final decision is AFFIRMED.

s/ *Nancy A. Vecchiarelli*
U.S. Magistrate Judge

Date:  May 25, 2012

---

economy, as the hypothetical to the VE did not include any mental limitations. This argument lacks merit because the ALJ's determination is based on her step four finding that Plaintiff could perform her past relevant work.